SECOND DIVISION

November 18, 2003

No. 1-01-1239 

THE PEOPLE OF THE STATE OF ILLINOIS, 

Plaintiff-Appellee, 

v.

CHARLES DODDS, 

Defendant-Appellant.   

)

)

)

)

)

)

)

)

)

Appeal from the 

Circuit Court of

Cook County.

Honorable

Bertina E. Lampkin, 

Judge Presiding.

JUSTICE BURKE delivered the opinion of the court:

Defendant Charles Dodds appeals from an order of the circuit court dismissing, without an evidentiary hearing, his petition for postconviction relief filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 
et seq.
 (West 2000)).  Defendant also appeals from the same order in which the trial court denied his motion for a new trial pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2000)).  On appeal, defendant contends that the trial court erred in dismissing his postconviction petition because new DNA evidence establishes that he was not physically connected to the crime scene in any way and, therefore, demonstrates his actual innocence.  Defendant also contends that the trial court erred in denying his motion for a new trial because the State presented false evidence and made false arguments to the jury.  For the reasons set forth below, we reverse and remand.

STATEMENT OF FACTS

Defendant was charged with the murders of Shirley Glenn and Thomas O'Connor based on events that occurred on February 5, 1985. The matter is before this court for a third time.  The facts were set out partially in our decision on direct appeal.  
People v. Dodds
, 190 Ill. App. 3d 1083, 547 N.E.2d 523 (1989).  Due to page limitations, only those facts relevant to the DNA issue are set forth here.

In addition to the testimony at defendant's jury trial of the investigating and arresting police officers, the detectives assigned to the case, defendant's friend who was a police officer, the assistant State's Attorney who obtained defendant's confession, and various witnesses who observed defendant and his conduct on the day in question, including the fact that he was present at the building where the victims were murdered on at least one occasion that day with Erwin Lewis, defendant's uncle, the State presented the testimony of Pamela Fish.  Fish testified that she was a criminologist in the serology unit of the crime lab for the Chicago Police Department.  Fish was asked to test certain evidence samples taken from the crime scene.  Fish stated that a stain recovered from the exterior side of the apartment door contained blood that was of human origin, but she was not able to determine the blood type because the sample was insufficient.  The same was true with respect to a stain on defendant's gray, white, and black striped sweater.  Fish also tested defendant's black pants, blue shorts (worn as underwear), and a brown sweater jacket.  Although none of these items had visible bloodstains on them, Fish stated that preliminary chemical tests indicated traces of blood scattered all over the items.  However, again, because of an insufficient quantity, she was not able to type the stains and she could not tell whether the blood was of human or animal origin.  No presence of blood was found on defendant's fingernail clippings, his shoes, socks, another sweater, and a shirt, nor on the knife recovered from the scene.  Fish further testified that if the clothes previously had blood on them and they were not properly cleaned, traces of blood would show up on testing.

After defendant's motion for a directed finding was denied, defendant presented the testimony of Officer Theatris Patterson.  Patterson, a latent print examiner, testified that defendant's fingerprints were not found on anything taken from the apartment following the murders, 
i.e.
, shot glasses, a tequila bottle, or a coffee cup.  However, Lewis' prints were found on the coffee cup.  On cross-examination, Patterson admitted that defendant could have touched the bottle or a shot glass and not left a print and the fact that no comparisons were made to defendant did not mean that defendant had not been present in the apartment.

Defendant also presented testimony from his mother that her brother, Erwin Lewis, confessed to her that he had committed the murders, as well as his own testimony in which he denied murdering Glenn or O'Connor.

The jury found defendant guilty of both murders and he was sentenced to natural life imprisonment.  Defendant appealed, and we affirmed.  
Dodds
, 190 Ill. App. 3d 1083.  Thereafter, defendant filed a petition for postconviction relief, which the trial court summarily dismissed as being frivolous and patently without merit.  Defendant appealed, and we granted defense counsel's 
motion for leave to withdraw pursuant to 
Pennsylvania v. Finley
, 481 U.S. 551, 95 L. Ed. 2d 539, 107 S. Ct. 1990 (1987), and affirmed the judgment of the circuit court.  
People v. Dodds
, No. 1-92-1655 (1992) (unpublished order under Supreme Court Rule 23).  Defendant then filed a second postconviction petition, which the trial court again dismissed. 

On January 25, 1999, defendant filed a motion for DNA testing pursuant to section 116-3 of the Code of Criminal Procedure of 1963.  725 ILCS 5/116-3 (West 2000).  The trial court granted the motion and defendant's bloodstained sweater, along with forensic blood samples from defendant, the victims, and Lewis were sent to the Illinois State Police Division of Forensic Services.  On May 8, 2000, forensic scientist Edgardo Jove reported that DNA extracted from defendant's sweater was consistent with originating from defendant and at least one unknown contributor, which could not have been Glenn, O'Connor, or Lewis.  Also sent to the lab were defendant's striped sweater, a brown sweater jacket, blue shorts, a turtleneck sweater, a pair of socks, black pants and belt, and a pair of shoes.  On July 22, Jove reported that no blood-like stains were noted on the shorts, socks, pants, or shoes.  In addition, no blood was indicated on the visible stains of the striped sweater, brown sweater, or turtleneck sweater.

Thereafter, on September 29, defendant filed a third postconviction petition, contending that he did not receive a fair trial because the State presented false testimony from Pamela Fish and made false arguments to the jury based on Fish's testimony.  Defendant also filed a motion for a new trial pursuant to section 2-1401 of the Code, contending that he was entitled to a new trial because the State presented false testimony through Fish.  On January 18, 2001, the State filed a motion to dismiss defendant's petition, contending that DNA evidence was not exculpatory and, therefore, defendant failed to demonstrate any prejudice as required for the court to consider a successive postconviction petition.  The State noted in this motion that the case involved one of first impression, 
i.e.
, that there were no reported cases where section 116-3 of the Code of Criminal Procedure had been used to bring a successive postconviction petition.  

At a hearing on the State's motion to dismiss defendant's postconviction petition on February 21, the trial court concluded that defendant had not made an affirmative showing of evidence that was of such conclusive character that it was likely to change the outcome of his trial.  According to the trial court, a negative match to the victims' blood on defendant's clothing did not exonerate defendant.  The court further concluded that a negative match did not provide evidence sufficient to override the witnesses' testimony at defendant's trial and his own confession.  Accordingly, the trial court granted the State's motion to dismiss defendant's postconviction petition.  In addition, the trial court denied defendant's motion for a new trial, concluding that there had been no showing by defendant that Fish's testimony was of such conclusive character as to deprive him of a fair trial.  This appeal followed.

ANALYSIS

I.  Dismissal of Postconviction Petition

Defendant contends that the trial court erred in dismissing his postconviction petition because the new DNA evidence demonstrates that the result upon a retrial would be different.  In this regard, defendant argues that, at trial, the State relied heavily upon the blood evidence but, now, it maintains that the blood evidence was only of minor importance.  Defendant maintains that the only evidence presented against him was his confession and the physical evidence, neither of which was strong.  Ultimately, defendant maintains that the evidence at his trial was closely balanced as demonstrated by his testimony and the fact that there was no other physical evidence found linking defendant to the murder scene.  According to defendant, had the jury heard that the blood on defendant's clothes, particularly his sweater, was not that of the victims, the result of his trial would have been different.  Thus, defendant maintains that the trial court erred in dismissing his postconviction petition.

The State contends that simply because none of the victims' blood was on defendant does not exonerate him of the crimes.  The State argues that the new DNA evidence does not exculpate defendant because his conviction was not dependent solely upon the blood evidence.  Rather, the State maintains that it merely argued at trial that the presence of blood on defendant was one of the indications of his guilt.  The State reiterates that it did not solely rely upon the blood evidence to convict defendant.  According to the State, even without the blood evidence, the evidence against defendant was overwhelming. 

The issue presented by this case, after posttrial DNA testing has been ordered and analyzed, what legal significance does the result have on the case in postconviction proceedings, has not yet been addressed by Illinois' courts.
(footnote: 1)  Specifically, when is an evidentiary hearing required to determine whether a defendant is entitled to a new trial where postconviction DNA evidence is involved?  More specifically, what impact does a negative or non-match DNA result have on a defendant's postconviction petition?
(footnote: 2)  

Because the use of posttrial DNA evidence is of relatively recent origin and there is no extensive case law or analysis on the issue, this opinion will detail the different stages of proceedings involving posttrial DNA evidence, the relevant inquiries and standards applicable, and the appropriate analysis to be undertaken.  Pursuant to section 116-3 of the Code of Criminal Procedure, a defendant may bring a motion for DNA testing subsequent to his trial and conviction.  725 ILCS 5/116-3 (West 2000).  To be entitled to DNA testing, the defendant must establish a 
prima facie
 case showing that "identity was [a] central issue at trial and that the evidence to be tested was subject to a sufficiently secure chain of custody."  
People v. Johnson
, 205 Ill. 2d 381, 393, 793 N.E.2d 591 (2002).  The trial court, at this time, must determine whether the evidence is new and materially relevant to the defendant's claim of actual innocence (
Johnson
, 205 Ill. 2d at 393), 
i.e.
, whether the evidence will tend to significantly advance that claim (
Johnson
, 205 Ill. 2d at 395; 
Savory
, 197 Ill. 2d at 213).  To determine this, the trial court must evaluate the evidence introduced at the defendant's trial as well as the new evidence the defendant seeks to test.  
Johnson
, 205 Ill. 2d at 396.  The focus at this time is on the State's use of DNA evidence at the defendant's trial, 
i.e.
, was the DNA evidence significant or collateral/minor at the trial compared to other evidence presented.  
Johnson
, 205 Ill. 2d at 396; 
Savory
, 197 Ill. 2d at 215.  Clearly, at this time, the court and the parties could only speculate as to the nature of the results of testing and could not compare the actual results to the evidence offered at the defendant's trial.  After undertaking its evaluation, if the trial court determines that testing is appropriate, it should order same.

Once the testing is complete, the nature of the results dictate whether any further course of action should be undertaken.  If the DNA results are inculpatory, no relief is available for the defendant.  See 
People v. Peeples
, 205 Ill. 2d 480, 538-39, 793 N.E.2d 641 (2002) (if DNA results show the source of a sample is from the victim, there is no postconviction relief available for the defendant).  Conversely, if DNA evidence is truly exculpatory, a defendant's conviction should be vacated and the defendant should be released, or some other similar resolution should be had.  See, 
e.g.
, A. Cohen, 
Innocent After Proven Guilty: More Inmates Being Set Free Thanks to DNA Tests and a Pioneering Legal Clinic
, Time, September 13, 1999, at 26, 28.  If the results are neither truly exculpatory nor inculpatory, 
i.e.
, they are somewhere in-between or are a non-match, which is the situation in the instant case, this may provide a basis for a defendant to file a postconviction petition asserting a claim of actual innocence based on newly discovered evidence.  
Henderson
, slip op. at 21.  The legal significance of a non-match, the subject of this case, is rarely addressed in case law.  See 
Henderson
, slip op. at 23.  See also 31 Cap. U. L. Rev. at 245 (noting that "[t]he standard to use in determining the significance of the postconviction DNA tests is not *** well established").

If the DNA results are in-between, the question then becomes, what happens once a postconviction petition is filed based on newly discovered evidence?  To raise a claim based on actual innocence, a defendant must submit new, noncumulative evidence that could not have been obtained during the defendant's trial with due diligence.  The evidence must also be so conclusive that it would probably change the result upon retrial.  
Johnson
, 205 Ill. 2d at 392;  
Henderson
, slip op. at 22.  
"This is the standard to be employed by a trial court when considering whether to grant postconviction relief based on a 'non-match' between a defendant-petitioner and the blood evidence that was secured in relation to the defendant's trial."  
Henderson
, slip op. at 22.  In other words, the trial court must consider the actual results of the DNA testing and determine the legal significance of the non-match.  
Henderson
, slip op. at 22.  

There are three stages of review provided for under the Act.  At the first stage, the trial court may dismiss, without any input from the State, the defendant's postconviction petition as frivolous or patently without merit.  
People v. Boclair
, 202 Ill. 2d 89, 99, 789 N.E.2d 734 (2002).  
If a petition survives this stage, it proceeds to the second stage.  At the second stage, the trial court may appoint counsel for the defendant, who will then have an opportunity to amend the petition.  
Boclair
, 202 Ill. 2d at 100.  At this stage, the State may also file a motion to dismiss the defendant's petition.  
Boclair
, 202 Ill. 2d at 100.  If the State fails to file a motion to dismiss, or the trial court denies same, and the trial court thus has concluded that the petition supported by the trial record and any accompanying affidavits makes a substantial showing of a constitutional violation, the petition proceeds to the third stage at which time the trial court conducts an evidentiary hearing on the merits.  
Johnson
, 205 Ill. 2d at 389; 
Boclair
, 202 Ill. 2d at 100. "The inquiry into whether a postconviction petition sufficiently alleges a substantial violation of petitioner's constitutional rights [the second stage] does not require the trial court to engage in any fact-finding or credibility determinations."  
People v. Fair
, 193 Ill. 2d 256, 260, 738 N.E.2d 500 (2000).  More specifically, as the court stated in 
People v. Coleman
, 183 Ill. 2d 366, 701 N.E.2d 1063 (1998):

"At the dismissal stage of a post-conviction proceeding, all well-pleaded facts that are not positively rebutted by the original trial record are to be taken as true.  The inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations.  The Act contemplates that such determinations will be made at the evidentiary stage, not the dismissal stage, of the litigation.  Due to the elimination of all factual issues at the dismissal stage of the post-conviction proceeding, a motion to dismiss raises the sole issue of whether the petition being attacked is proper as a matter of law."  
Coleman
, 183 Ill. 2d at 385.

At both the first and second stages, the trial court's decision is a ruling upon the legal sufficiency of the allegations of the petition and, therefore, our review is 
de novo
.  
Johnson
, 205 Ill. 2d at 389.  At the third stage, the trial court must determine whether the evidence introduced at the evidentiary hearing demonstrates that the defendant is entitled to relief, 
i.e.
, in the case of DNA non-match evidence, whether the DNA evidence is so conclusive that it would probably change the outcome on a retrial.  The trial court should not collapse the second and third stages of postconviction proceedings.  See 
Henderson
, slip op. at 23.

Initially, in the case 
sub judice, 
there appears to be some confusion on the part of the State at what stage this case was dismissed.  On one page of its brief before this court, the State maintains that it filed a motion to dismiss defendant's postconviction petition, which the trial court granted.  However, on the next page of its brief, the State indicates that the trial court summarily dismissed defendant's postconviction petition.  Similarly, at oral argument before this court, when asked what stage the case was dismissed at, the State responded that it was the first stage.  When this court commented that defendant had counsel and the State had in fact filed a motion to dismiss, the State conceded it was a second stage dismissal.  Accordingly, the question before this court is whether defendant's petition made a substantial showing of a constitutional violation warranting a third stage evidentiary hearing.  
People v. Edwards
, 197 Ill. 2d 239, 246, 757 N.E.2d 442 (2001).

Before we determine whether defendant was entitled to an evidentiary hearing, we consider defendant's argument that because the State agreed to DNA testing, it conceded that defendant presented a 
prima facie
 case under section 116-3 for DNA testing, 
i.e.
, the State acknowledged that DNA results could materially advance his claim of actual innocence.  Defendant maintains that, in other words, the State conceded that a physical tie between him and the crime scene was crucial.  The State responds that, even if it agreed to testing, this does not equate to an admission that the results of such testing would meet the requirements for newly discovered evidence, 
i.e.
, it did not concede that the results are of such conclusive character as to change the outcome on a retrial.   As the State points out, the record is silent with respect to its position.  Defendant filed his motion for DNA testing.
(footnote: 3)  According to the half sheets, defendant's attorney and an assistant State's Attorney were present in court on the 23rd of some unknown month in 1999.  At this time, the State apparently indicated that only one item was suitable for testing.  However, there is no report of proceedings from this court date.  Thereafter, on November 15, 1999, the trial court ordered testing.  There is no evidence that the trial court conducted a hearing on defendant's motion.  Thus, the record is unclear as to whether the State agreed to DNA testing or not.

Even assuming, 
arguendo
, that the State agreed to such testing, we do not find that its concession has an impact on the issue before this court.  The fact that the State agreed or failed to object to testing only means that the State conceded that the results may be materially relevant and may significantly advance defendant's claim, 
i.e.
, it conceded that defendant had made a 
prima facie
 case and was entitled to testing.  The State's concession at the motion stage does not equate to a concession at this second postconviction stage that the results warrant an evidentiary hearing.  This is so because the nature of the results themselves dictate whether an evidentiary hearing is warranted.  For example, if the results are inculpatory and, thus, the defendant would not be entitled to any postconviction relief, it would be illogical to require an evidentiary hearing on the sole basis that the State agreed, or failed to object, to DNA testing.  Nor does the State's concession equate to a concession that the results are so conclusive that they warrant a new trial.  The State could not make such a concession at the motion stage because it did not know the results of the testing.  Thus, the State's concession, if any, at the motion stage merely begins our inquiry into the significance or impact of the results at this stage.  The State here does not contest the propriety of the testing and, therefore, its concession below does not determine whether defendant was entitled to an evidentiary hearing based on those results.

Having resolved the above issue, we now determine whether the trial court erred in dismissing defendant's postconviction petition without a third stage evidentiary hearing, since not every case involving postconviction DNA testing will warrant an evidentiary hearing.  As stated above, the results of the DNA testing, not the simple fact that testing was allowed, nor the State's failure to object to testing, dictate the course of action that should be followed at postconviction proceedings since only exculpatory or in-between results could possibly warrant relief.  

In the instant case, we find that the trial court erred in dismissing defendant's postconviction petition without a third stage evidentiary hearing.  We hold that once DNA testing is ordered and the results are favorable, at least in part, to a defendant, such as where a non-match is revealed, an evidentiary hearing is necessary to determine the legal significance of the results because such results would make a substantial showing of a constitutional violation.  In other words, the trial court is obligated to conduct an evidentiary hearing to determine whether the DNA results would or would not likely change the results upon a retrial.  See K. Christian, "
And the DNA Shall Set You Free": Issues Surrounding Postconviction DNA Evidence and the Pursuit of Innocence
, 62 Ohio St. L. J. 1195, 1195 (2001) (advocating that if postconviction DNA results are favorable to a defendant, the defendant should receive a hearing to determine whether he or she is entitled to a new trial).  See also National Institute of Justice, 
Postconviction DNA Testing: Recommendations for Handling Requests
 1, 50 (1999) (stating that "if DNA testing results seem to exculpate the defendant because of an exclusion, an evidentiary hearing should be set to determine if there is a reasonable probability of a change in the verdict or judgment of conviction").  In this regard, the court's comments in 
State v. DelReal
, 225 Wis. 2d 565, 593 N.W.2d 461 (App. 1999), are relevant.  In 
DelReal
, the court stated that while "negative evidence may not disprove a defendant's guilt, *** it certainly has a 'tendency' to make it 'less probable.'  [Citation.]"  
DelReal
, 225 Wis. 2d at 574, 593 N.W.2d at 465.  In addition, the court noted that while a negative result does not rule out admissibility of the test results, it does go toward the weight of the evidence and such "was relevant, exculpatory evidence because the negative test result would have some weight and its tendency could have supplied a favorable inference of [the defendant's] innocence to the jury."  
DelReal
, 225 Wis. 2d at 571-72, 593 N.W.2d at 464-65.  Here, as in 
DelReal
, although not conclusive exculpatory evidence, the non-match for DNA evidence on the bloodstains on defendant's clothing could have supplied a favorable inference of defendant's innocence.  It is for the trial court, upon remand, to so determine.

Upon remand, the trial court must apply the proper standard for evaluating newly discovered evidence and determine, in the third stage evidentiary hearing, whether defendant is entitled to a new trial.  At the evidentiary hearing, the trial court must consider the trial evidence in light of the new DNA results to determine whether those DNA results are so conclusive to warrant a new trial.  
C.f.
 
Savory
, 197 Ill. 2d at 214.  See also 31 Cap. U. L. Rev. at 264 ("The newly tested DNA evidence must be weighed against the other evidence presented in the case to show that the defendant deserves to have the case heard again").  The trial court also must determine whether the DNA evidence was a significant factor at defendant's trial and, thus, whether such evidence was more likely than not to have affected the jury's determination.  See 
Henderson
, slip op. at 16-17.  Only upon an evaluation of the weight of the evidence and credibility of same will the trial court be able to determine whether the DNA results are so conclusive to warrant a new trial.  While this weighing of evidence is similar to the weighing of evidence with respect to the section 116-3 motion for DNA testing, it nonetheless clearly differs.  Here, the trial court has the actual DNA results, whereas at the time of the motion for testing, the trial court could only speculate as to the nature of the results.  The determinations to be made at the third stage evidentiary hearing require factual and credibility findings.  

We note that in the instant case, the trial court made such factual and credibility determinations at the second stage of the postconviction proceedings.  Specifically, the last two paragraphs of the trial court's order read like those of a trier of fact made after a third stage evidentiary hearing.  Because this case was at the second stage, the trial court's factual and credibility determinations were improperly made.  
Coleman
, 183 Ill. 2d at 385; 
People v. Faraone
, 316 Ill. App. 3d 897, 899-900, 738 N.E.2d 571 (2000).  More specifically, a comprehensive review of the evidence to determine the legal significance of the new DNA evidence is not proper at the second stage of postconviction proceedings; it must be undertaken at a third stage evidentiary hearing.  Accordingly, we conclude that the trial court erred in dismissing defendant's postconviction petition without an evidentiary hearing.  We therefore remand this cause for an evidentiary hearing and such further proceedings consistent with this opinion.

II.  Motion for New Trial

Defendant next contends that the trial court erred in denying his motion for a new trial because the State presented false or perjured evidence and made false arguments at his trial.  Based on our conclusion above with respect to defendant's postconviction petition, we need not address this issue as it will be decided in the further proceedings conducted upon remand.

CONCLUSION

For the reasons stated, we reverse the judgment of the circuit court of Cook County and remand this cause for further proceedings.

Reversed and remanded.

CAHILL and GARCIA, JJ., concur.

FOOTNOTES
1:
The only cases discussing postconviction DNA testing have addressed the propriety of the trial court's denial of posttrial testing.  See 
People v. Savory
, 197 Ill. 2d 203, 756 N.E.2d 804 (2001); 
People v. Henderson
, Nos. 1-99-1277, 1-99-3220 (Cons.) (September 25, 2003); 
People v. Travis
, 329 Ill. App. 3d 280, 771 N.E.2d 489 (2002).

2:
Negative or non-match results are those, as in the instant case, where the results show that the victim was not the source of a certain sample (defendant's clothing here), but which results do not necessarily exclude the defendant as the perpetrator.  In other words, although defendant here may have shown that the blood on his clothing was not that of the victims, this does not rule him out as the murderer.  See, 
e.g.
, Comment, 
Motions for Postconviction DNA Testing: Determining the Standard of Proof Necessary in Granting Requests
, 31 Cap. U. L. Rev. 243, 264 (2003) (the "absence of DNA does not necessarily mean the perpetrator was not in contact with the crime scene or victim.  Similarly, the absence of a victim's DNA on a perpetrator or his property does not mean there was no contact between the two").

3:
This motion is not contained in the record on appeal.